UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

CIVIL ACTION NO. 1:08-CV-00114-JHM

GERALD FULKERSON, et al.                                          PLAINTIFF

and

INDEMNITY INSURANCE COMPANY                                       INTERVENOR
                                                                  PLAINTIFF

V.

KONECRANES, INC.                                                  DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Konecranes, Inc.'s Motion for Summary Judgment [DN 110]. Fully briefed, this matter is ripe for decision. For the following reasons, Defendant's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.

## I. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586

(1986). The rule requires the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by " showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

## II. BACKGROUND

Plaintiff Gerald Fulkerson was employed by Sensus Metering Systems on July 31, 2007, when he was severely injured operating the number two hot metal carrier.[1] Sensus is in the die casting industry and makes aluminum castings for different companies. Plaintiff's primary job with Sensus was to skim the furnaces, however, he occasionally operated the hot metal carrier. A hot metal carrier transports molten aluminum from the furnace room to holding furnaces at their die cast machines. The carrier operates using several wire ropes, pulleys, and trolleys. While Plaintiff was operating the number two hot metal carrier on July 31, 2007, the back wire rope attached to one of the trolleys broke, causing molten aluminum to spill onto the floor. When the molten aluminum spilled over it ignited a flash fire due to the presence of hydraulic fluid on the floor. Plaintiff was severely burned by the fire.

Sensus contracted with Defendant Konecranes, Inc. to conduct quarterly OSHA level inspections of the hot metal carriers within Sensus's facility as well as an annual inspection of the entire Sensus plant. During these inspections, one of Defendant's technicians would inspect the hot metal carrier, all drums for the hot metal carrier, the wire ropes, the sheaves and the blocks. The

---

[1] There were two hot metal carriers at the Sensus facility. For clarity's sake, the Court will refer to the hot metal carrier at issue as the number two hot metal carrier.

2

technician would also look for excessive fleet angles, abrasion issues and wire rope length issues. An excessive fleet angle arises when there is too much or too little wire rope used in the pulley system. This could cause the wire rope to rub against the blocks when the hot metal carrier's ladle is in its uppermost position.

Konecranes technician Kerry Outland performed a quarterly inspection for Sensus on June 16, 2007. During the inspection, Outland examined the two hot metal carriers in the facility. In his report, Outland documented no safety issues regarding abrasion, the length of the wire rope, or excessive fleet angle issues on the number two hot metal carrier. However, in his post-inspection discussion with his supervisor, Jim Cosby, Outland mentioned seeing some slight abrasion on the back wire rope of the number two hot metal carrier.

### III. DISCUSSION

Plaintiff filed suit against Defendant on claims of products liability, negligence and gross negligence as well as loss of consortium. Plaintiff's primary claim against Defendant is that it was negligent in its inspection on June 16, 2007. Defendant Konecranes has moved for summary judgment on the basis that Plaintiff cannot demonstrate that Defendant breached its duty by performing a negligent inspection on June 16.[2] To succeed on a claim of negligence the plaintiff must establish that (1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached its duty, and (3) the breach proximately caused the plaintiff's damages. Pathways, Inc. v. Hammons, 113 S.W.3d 85, 88 (Ky. 2003). Plaintiff claims that evidence of abrasion to the wire rope, damage to the lower block, and an excessive fleet angle were all present during Outland's inspection of the number two hot metal carrier and that he failed to document them. Plaintiff contends that the failure

---

[2] For purposes of this motion, the Court will assume that Plaintiff has satisfied the duty element.

3

to document these conditions constitutes negligence on the part of the Defendant. In order to survive summary judgment, Plaintiff must demonstrate that there is a genuine dispute of material fact that those conditions existed on June 16, 2007.

All of the experts who examined the wire rope testified that on July 31, 2007, there was significant abrasion on the wire rope that likely contributed to its failure, but, no one could say with certainty how long it had taken for that abrasion to develop. The experts' testimony on this issue, including Roger Davis, Plaintiff's expert, was that this type of abrasion can develop over several hours, days or even months. Davis believes that the evidence of abrasion would have been obvious to Kerry Outland at the time of his last inspection. In fact, Jim Cosby, Outland's supervisor at Konecranes, testified that Outland did discuss the presence of abrasion on the wire rope at issue during his post-inspection oral report with Cosby. However, neither the existence or extent of the abrasion was documented by Outland. Davis is of the opinion that Outland should have determined the cause of the abrasion and documented it as a part of his inspection.

Davis has issued a report finding several areas of deficiency related to Konecranes inspection of the hot metal carrier. Davis's evaluation of the number two hot metal carrier is based on an inspection of the broken wire rope conducted over two years after the accident, and pictures of the hot metal carrier taken immediately after the accident. One of Davis's findings is that Kerry Outland, Konecranes technician, failed to document an excessive fleet angle that created a safety hazard. Plaintiff's expert relies on pictures of the number two hot metal carrier taken after the accident with new wire ropes in place to determine that an excessive fleet angle existed prior to the accident. Plaintiff's expert claims that the pictures show that the new wire rope is too short, which would cause the hot metal carrier to have an excessive fleet angle when the ladle was in the uppermost position. Plaintiff's expert then says that he believes the wire rope that failed was the same length because

4

> typically when a rope is replaced, the buyer will take a measurement of the rope and buy the same length that he has bought in the past. In this case, I think they probably routinely buy it and probably have a standing order for a given length of rope. I don't know that for a fact, but that would be the most likely scenario.

Davis Dep. 59:22-60:3.

Davis's opinion regarding the length of wire rope is based only on speculation. He readily admits that he did not see or measure the wire rope prior to the accident. He has nothing to show that the length of the wire rope that failed was the same length as the wire rope in the post-accident pictures, other than his guess. Davis has nothing, other than his assumption, to show that the procedure for acquiring new wire rope that he described is actually the procedure employed by Sensus. However, Davis has other evidence to support his fleet angle theory----the condition of the bottom block at the time of the accident..

The actual block was lost before the various experts could physically examine it. However, the experts were able to evaluate its condition through post-accident pictures. The photographs of the lower block show enlarged slots indicating a great deal of wear from the wire rope. Davis's report states

> The rope failed near the dead end, about 30 inches from the thimble. The surfaces that the rope rubbed against to abrade it are the sheave and side covers of the bottom block. The photograph provided appear to show enlarged slots where the rope rubbed the side covers. For the rope to contact the side cover, it had to pull at an angle (the so-called fleet angle). The fleet angle is formed by the running wire ripe between the drum and the bottom block sheave and it varies with the drum groove the rope enters and the distance between the drum and block. The fleet angle should lie between 1/4° and 1-1/4°. For the incident hoist, the fleet angle becomes larger as the bottom block approaches its highest position. The abrasions of the rope occur where the fleet angle is larger.

Davis Report 7-8.

When shown a picture of the damage to the lower block, Jim Cosby, Outland's supervisor, testified that the damage shown would likely have developed over a period of several months.

Plaintiff also believes that is very likely and asserts that if Kerry Outland had done a proper inspection, and had looked for a cause for the abrasion that he did see, he would have discovered the source of the abrasion.

Drawing all reasonable inferences in favor of Plaintiff, the Court finds that there are genuine disputes of material fact regarding the presence of abrasion and damage to the wire rope and lower block during the June 16, 2007, inspection. These genuine disputes make summary judgment inappropriate.

Defendant argues, in the alternative, that the actions of Sensus were a superseding cause of Plaintiff's injury. "The question of whether an undisputed act or circumstance was or was not a superseding cause is a legal issue for the court to resolve, and not a factual question for the jury." House v. Kellerman, 519 S.W.2d 380, 382 (Ky. 1974). Defendant contends that Sensus's failure to keep the floor clear of flammable materials, to properly train Plaintiff, and to conduct the daily and monthly inspections, among other things, were all superseding causes of Plaintiff's injury that break the chain of causation. However, it is well settled that "if the resultant injury is reasonably foreseeable from the view of the original actor, then the other factors causing to bring about the injury are not a superseding cause." NKC Hosps., Inc. v. Anthony, 849 S.W.2d 564, 568 (Ky. Ct. App. 1993). That Plaintiff could be badly burned as the result of the wire rope breaking and spilling molten aluminum was reasonably foreseeable by Defendant. Therefore, any negligence attributable to Sensus was not a superseding cause.

Plaintiff's complaint also includes a products liability claim alleging that Defendant is liable for the design, manufacture, assembly, testing, marketing, and advertisement of a product that was unreasonably dangerous and defective. Defendant contends that there is no evidence that it was involved with this product in anyway other than its quarterly inspection. Plaintiff's response does

not address this claim. The Court finds that Defendant is entitled to summary judgment on the products liability claim.

Defendant has moved for summary judgment against the Intervening Plaintiff as well. The Intervening Plaintiff, Indemnity Insurance Company, is a worker's compensation carrier and may only recover the benefits it has paid to Plaintiff from one who is legal liable for Plaintiff's damages. Defendant contends that because Plaintiff's claims fail as a matter of law that the Intervening Plaintiff's claims must also necessarily fail. However, having found that summary judgment against Plaintiff was only appropriate on the products liability claim, the Court finds that summary judgment against the Intervening Plaintiff is only appropriate as to the products liability claim. Therefore, the Court finds that just as the Plaintiff's negligence and gross negligence claims survive summary judgment, so too does the Intervening Plaintiff's negligence and gross negligence claims.

## IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant Konecranes' Motion for Summary Judgment [DN 110] is **GRANTED** in part and **DENIED** in part. It is **GRANTED** as to Plaintiff's and Intervening Plaintiff's products liability claims and is **DENIED** as to all other claims of Plaintiff and the Intervening Plaintiff.

cc: counsel of record